Louis Turner, et al. [1] v. Commissioner. Turner v. Commissioner
Docket Nos. 23876, 23877, 23878, 23879, 26020, 26021.
United States Tax Court
1951 Tax Ct. Memo LEXIS 101; 10 T.C.M. (CCH) 869; T.C.M. (RIA) 51276; September 18, 1951
*101 Robert Ash, Esq., 550 Munsey Bldg., Washington 4, D.C., Carl F. Bauersfeld, Esq., and Charles S. Ausley, Esq., Tallahassee, Fla., for the petitioners. Newman A. Townsend, Jr., Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined deficiencies in the income tax of the petitioners for 1944 as follows: Docket No.
Deficiency
23876
Louis Turner
$9,199.43
23877
Lena Turner
9,492.18
23878
C. Davis Turner
8,645.66
23879
Gene Abel Turner
9,810.97
26020
H. S. Turner
9,361.31
26021
Elizabeth Turner
9,468.30
Issues presented by the pleadings are (1) whether the sons of certain of the petitioners and the daughter of the others were members with petitioners in a partnership known as Turner's, and (2) whether the period of limitations for assessment of the deficiencies determined against H. S. Turner and Elizabeth Turner has expired. Issue No. 2 was abandoned at the trial, leaving only Issue No. 1 for determination. Findings of Fact Part of the facts were stipulated and are found accordingly. Louis Turner and Lena Turner are husband and wife, residing at Tallahassee, *102 Florida. C. Davis Turner and Gene Abel Turner are husband and wife, residing at Marianna, Florida. The foregoing petitioners filed their separate 1944 income tax returns with the collector at Jacksonville. H. S. Turner and Elizabeth Turner are husband and wife. They reside at Andalusia, Alabama, and filed their separate 1944 income tax returns with the collector at Birmingham. H. S. Turner, C. Davis Turner and Louis Turner are brothers. H. S. Turner is the oldest, and Louis Turner is the youngest. H.S. and Eliabeth Turner, have one child, a daughter, Rebecca. She was born February 1, 1917, and in 1945 married a man named Rosen. C. Davis and Gene Abel Turner have two sons, Jerome, born August 4, 1926, and the other born April 14, 1929. Louis and Lena Turner have three sons. Melvin, who is the oldest, was born September 13, 1928. Two other sons were born about 1932 and 1941, respectively. The father of H.S., C. Davis and Louis Turner conducted a mercantile business in a suburb of Birmingham and each of the sons worked in their father's business. H. S. Turner went to Florida in 1912 and C. Davis and Louis Turner went there in 1917 and 1919, respectively. In 1927, the three Turner *103 brothers began business for themselves by organizing a corporation known as Turner Mercantile Company, Inc., and through it, operating a store in Tallahassee. Other stores were opened, until the corporation had ten or twelve stores. Due to the depression all the stores were closed except one in Tallahassee, one in Marianna and another in Quincy, Florida. About 1936, the store at Quincy was moved to Andalusia, Alabama. H. S. Turner was in charge of the store at Quincy and was also in charge after it was moved to Andalusia. C. Davis Turner was in charge of the Marianna store and Louis Turner was in charge of the one in Tallahassee. It is about 200 miles from Andalusia to Tallahassee. Marianna is between the two and is about 125 miles from Andalusia. By July 1, 1941, all of the stock in the corporation which had been owned by others than the Turner family had been acquired by members of that family so that on that date the corporation's stock was owned in equal amounts by the Turner brothers and their wives, who were also working in the business. The corporation was dissolved on July 1, 1941. Its business and assets were transferred to a partnership known as Turner's, which was composed *104 of the Turner brothers and their wives. The partnership agreement contained the following: "THIS CONTRACT, made and entered into this, July 1, 1941, between Louis Turner, and his wife, Lena Turner, both of Leon County, Florida, parties of the first part, H. S. Turner, and his wife, Elizabeth Turner, both of Covington County, Alabama, parties of the second part, and C. Davis Turner, and his wife, Gene Abel Turner, both of Jackson County, Florida, parties of the third part, said six persons being hereinafter referred to as the partners; WITNESSETH: "WHEREAS, until this date each of the partners had owned an equal share of the outstanding capital stock of Turner Mercantile Company, Inc., a corporation, which was operating retail mercantile stores in Tallahassee, Florida, Andalusia, Alabama, and Marianna, Florida, which corporation is no longer doing business, and the partners, each owning a one-sixth undivided interest in all of the assets of said corporation, desire to continue in business as co-partners under the name of Turner's; and "WHEREAS, the partners now desire to enter into this contract for the purpose of establishing and setting up the said partnership, and also to *105 set forth other agreements and understandings between them with reference to the said business; the business at Tallahassee, being managed by Louis Turner, the business at Andalusia being now managed by H. S. Turner, and the business at Marianna being now managed by C. Davis Turner; now, therefore, "IN CONSIDERATION OF THE PREMISES, the mutual promises herein contained, and the sum of One Dollar to each partner is hand paid by the others, the receipt whereof is hereby acknowledged, it is agreed as follows: "1. The partners hereby enter into a partnership to be known as Turner's. The assets of the partnership shall consist of the assets of the recent corporation Turner Mercantile Company, and which are now in possession of the partners at the places of business in Tallahassee, Andalusia, and Marianna, as aforesaid. Each of the said partners owns a one-sixth interest therein; each shall be entitled to one-sixth of the net profits thereof; each hereby obligates himself for the payment of one-sixth of the losses; and each is responsible for a one-sixth share of the obligations of said business. "2. One of the partners shall be selected by the partners as the Managing Director of *106 the business to be conducted and as such he is to be empowered to perform similar duties to those which were performed by the President of said Turner Mercantile Company, Inc., insofar as such duties are applicable to the management of partnership affairs. Such manager is to serve at the pleasure of the partners. "3. The partnership shall exist during the pleasure of the partners. "4. It is the wish and desire of the partners that in the event of the death of one or more of them that his widow and other heirs at law shall permit the interest which they inherit from him to remain in the business, and it is the desire of the partners that the business continue as long as practicable after the death of one or more of the male partners. "5. At the time of the execution of this contract the wife of each of the partners is employed in one of the businesses being operated by the partnership. Upon the death of a male partner, his widow shall have the right to retain her then position of employment in such place of business at a salary at least equal to what she is then receiving; provided, she shall have said employment only so long as the interest of her deceased husband is owned by *107 her and his other heirs and is permitted to remain in the business of the partnership; and provided that a store is maintained by the surviving partners in the city in which she was so employed at the time of the death of her husband. As to whether or not a store is maintained in said city after the death of a partner shall be left entirely to the determination of the surviving male partner or male partners. "6. Upon the death of any of the male partners, provided the interest of such deceased partner remains in the business, the partnership shall pay to the widow of such deceased partner the sum of $100.00 per month for the duration of her natural life, beginning upon the expiration of fifty months from the first day of the month following the death of said male partner. However, on account of the fact that the party of the second part, H. S. Turner, is unable to obtain any life insurance, said partnership shall pay to his widow, in addition to the $100.00 per month, beginning fifty months after the death as above provided, the sum of $100.00 per month for a period of fifty months beginning the first day of the month following the death of said partner. Said payments shall be made *108 only upon condition that the interest of said deceased partner in said partnership is allowed to remain in the business and the widow and his heirs continue to be the owners and holders of said interest. In the event the widow or the heirs of a deceased partner dispose of any part or all of her or their interest in said partnership, or for any other reason all of said interest does not remain therein, then the payments provided for in this paragraph shall immediately cease insofar as said widow is concerned. The widow and heirs shall also be entitled to their share of the net profits of the business. "7. After fifty months from the death of any of the male partners, and provided the business has been kept intact by all of the interests being permitted to remain in same, the surviving partners, or partner, shall be obligated to purchase for cash from the widow and heirs of the deceased partner the interest which they have in the business if requested to do so by said widow and heirs, at the minimum purchase price of 75% of one-third of the net worth of the business, but the said widow and heirs shall not be required to sell same at that price if they do not desire to do so. At least *109 six months written notice of their intention to sell under the terms of this section of the contract must be given to the other partners by such widow and heirs. "8. Upon the death of any of the male partners, it is understood and agreed between the surviving partners, and the widow of the deceased partner, that the surviving male partners shall have the exclusive right to manage the business. "9. The wives of the parties to this contract join in the execution of same, and, in consideration of the premises and the benefits to accrue to them, agree to be bound by the terms hereof in all respects." The partnership operated under the name of "Turner's" the three stores formerly operated by the corporation. The stores were retail clothing establishments which handled both men's and women's ready-to-wear and furnishings, including shoes. However, about 1942, and upon the insistence of Rebecca Turner that it would be better business policy, the Andalusia store discontinued handling men's ready-to-wear and furnishings and limited its business to women's ready-to-wear and furnishings. About 1940 or 1941, a number of military establishments were opened near Marianna and Tallahassee and *110 in 1942 the partnership stores in those places began to sell uniforms and military equipment. After the first year or two of handling such merchandise, the major portion of such sales by the Marianna store was made at wholesale to various post exchanges. While the stores primarily sold for cash, they did some credit business. Under the partnership agreement, C. Davis Turner was selected as managing director of the partnership and he had general supervision over the operations of all the stores. The books of account for all three stores were kept in Marianna under his supervision. However, each store checked its own credits, made its own collections and maintained books as to its accounts receivable. Each store bought its own merchandise, but all bills and invoices were paid from the Marianna store. Each store made its own deposits in a local bank and made a report thereof to the Marianna store. By late 1943, Elizabeth Turner's health was such that she could not render full service to the Andalusia store. Rebecca at that time was approaching her twenty-seventh birthday, and since her high school days had worked regularly, first in the store at Quincy and then at Andalusia. It was *111 she who had been responsible, as above noted, for the change of that store to the handling of women's wear exclusively, a change which was already justifying itself. About the middle of 1943, and to improve her knowledge of the ladies' ready-to-wear business and to obtain a better knowledge of merchandising and of the design and style of dresses, she had entered the employ of a maternal uncle who conducted a wholesale ladies' ready-to-wear business in Atlanta. Her uncle let her come and go as she wished and once a month she would go to Andalusia and spend several days at home and in the Andalusia store. On several occasions while she was in Atlanta she was able to purchase "hard to get" merchandise for Turner's. Because of the knowledge and experience she had gained and because of her mother's health, the partners late in 1943 concluded that it would be helpful to have Rebecca as a partner. To effect her inclusion in the partnership, her father and mother transferred to her one-fourth of their interests in the partnership, to the end that after the transfers her father and mother should each hold a three-twenty-fourths partnership interest and Rebecca should hold a two-twenty-fourths *112 interest. C. Davis Turner and Louis Turner had had in mind that eventually they would like to have their respective sons, Jerome and Melvin, as members of the partnership, and C. Davis Turner had informed Jerome of this desire, on the condition that Jerome should apply himself to learning the business. At the time of the transfers of interests by H.S. and Elizabeth Turner to Rebecca, C. Davis Turner and Louis Turner and their respective wives executed comparable instruments to Jerome and Melvin. Jerome was then seventeen years of age, and Melvin was fifteen. Except for the differences in the names of the parties, the following instrument executed by Louis Turner is typical of the instruments executed by the three brothers and their wives: "KNOW ALL MEN BY THESE PRESENTS: "That I, LOUIS R. TURNER, of Leon County, Florida, for and in consideration of natural love and affection, do hereby give, assign, transfer and set over unto MELVIN WALTER TURNER of Leon County, Florida, a one-twenty-fourth (1/24) interest in and to that certain partnership business existing between LENA M. TURNER, of Leon County, Florida, H. S. TURNER and ELIZABETH TURNER, of Covington County, Alabama, and *113 C. DAVIS TURNER and GENE ABEL TURNER, of Jackson County, Florida, and me, trading and doing business as TURNER'S, and to the assets and profits thereof. "It is understood that my present interest in said partnership is a one-sixth interest therein, and that the gift, transfer and assignment to the said MELVIN WALTER TURNER of an one-twenty-fourth (1/24) of my one-sixth interest [2] reduces my said interest in said partnership to a three-twenty-fourths (3/24) interest therein. "IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of January, A.D. 1944. Signed, sealed and delivered in our presence as witnesses: Louis R. Turner (Seal) Annette Leibowitz Pearl Davidson We, the undersigned, being all of the partners of TURNER'S do hereby consent to the transfer of an one-twenty-fourth (1/24) interest in the partnership business by LOUIS R. TURNER to MELVIN WALTER TURNER. Elizabeth Turner (Seal) H. S. Turner (Seal) Gene Abel Turner (Seal) C. Davis Turner *114 (Seal) Lena M. Turner (Seal) The two instruments applicable to Melvin were deposited in the safe at the Tallahassee store and the two applicable to Jerome were deposited in the safe at the Marianna store. Each of the Turner parents filed a gift tax return, upon which the one-twenty-fourth interest described was shown at a value of $5,617.72. No tax was due or paid upon the returns as filed. After the execution of the above-mentioned instruments, the business and assets of Turner's remained as they were before. Nothing was added or paid in by Rebecca, Jerome or Melvin. No partnership agreement was drawn or executed showing a nine-member partnership as having resulted from transfers of interests to the three named individuals. Neither Rebecca, Jerome nor Melvin ever signed or executed any partnership agreement. Notice of the creation of such partnership was not published in the newspapers, nor, so far as disclosed, were the firm's customers or suppliers of merchandise, or its creditors notified. There was no registration of the partnership under the Florida fictitious name statute. C. Davis Turner did give written notice to the insurance companies which issued policies to the *115 partnership, stating that Rebecca, Jerome and Melvin had been admitted to the firm. H. S. Turner also notified the insurance agent who handled the insurance for the Andalusia store to like effect. C. Davis Turner also told the employees in the Marianna and Andalusia stores that the three had been admitted to the partnership. During 1944, the partnership maintained accounts at the following banks: The Commercial Bank, Andalusia, Alabama. The First Bank of Marianna, Marianna, Florida. The Citizens State Bank, Marianna, Florida. The Capital City National Bank, Tallahassee, Florida. The Citizens Peoples National Bank, Pensacola, Florida. The Barnett National Bank, Jacksonville, Florida. The Citizens Southern National Bank, Atlanta, Georgia. The Chase National Bank, New York, New York. So far as disclosed, none of the banks with which the partnership transacted business were notified in writing of any change in the membership of the partnership. However, The Commercial Bank in Marianna and The Capital City National Bank in Tallahassee did receive word orally to the effect that changes had been made. C. Davis Turner had authority to sign checks drawn on each of the *116 partnership bank accounts and he alone had authority to sign checks drawn on the accounts in New York, Atlanta, Pensacola and Jacksonville. His wife, H. S. Turner, Louis Turner and their wives were also authorized to sign checks drawn on the partnership accounts at banks in the towns where they lived. Partnership checks signed by Rebecca and Jerome and drawn on banks which had been notified orally that they were members of the partnership were honored by such banks. However, practically all of the checks issued by the partnership were drawn in Marianna and were signed by C. Davis Turner. About June 1, 1944, Rebecca left the employ of her uncle and returned to Andalusia, and has since continued working full time in the store there. After her return she had a strong voice in determining, if she did not dominate, store policy, the shoe department possibly being an exception. She took over and performed most of the work her mother had been doing. She sold merchandise, helped with the buying, helped take inventory, helped with the bookkeeping, sent out all statements and handled all the correspondence, passed on credit, made adjustments, and contacted special customers as to receipt of *117 scarce merchandise. At times she acted as cashier for the store, receiving money paid on cash sales or on accounts, made up bank deposits and carried them to the bank, and withdrew money from the bank. She also discussed with her parents and other partners business matters relating to personnel, advertising, purchasing, etc. In the absence of her parents, she had complete charge of the store, including the supervision of its four employees consisting of two saleswomen, an alteration woman and an errand boy. During 1944, she and her mother attended four fashion shows in Atlanta and a like number in Birmingham. The major portion of the merchandise bought for the store on these occasions represented the mutual selection of Rebecca and her mother. The remainder represented the independent selection of each. Also on one occasion in 1944 Rebecca went alone on a trip to New York City, where she selected and purchased from a number of wholesale houses substantial quantities of merchandise for the store. During the time in 1944 when Rebecca resided in Andalusia, she lived at home with her parents, who bore all expenses of the home, and she did not pay for her room and board. Such money as she *118 withdrew from the business was used by her for incidental expenses and spending money. In 1944, C. Davis Turner had been in the mercantile business for 29 years. During 1944 he was, as previously, in charge of the Marianna store. He was managing director of the partnership and generally supervised the operations of the other stores. He had charge of the partnership's books of account, looked after financial matters of the partnership, and alone signed for the partnership all notes upon which money was borrowed for the business. Merchandise was difficult to obtain and he traveled extensively to New York and various other places to purchase merchandise for the Marianna store. He did most of the buying for the store. An employee at this store, H. Gluckman, who was paid $125 a week, also traveled to various places and purchased military goods. When salesmen came to the store and C. Davis Turner was there, he selected most of the merchandise that was purchased. When he was not there, purchases were sometimes made by Jerome. C. Davis Turner also participated in civic affairs, which took him away from the store at times. Gene Abel Turner devoted most of her time to the business of the store. *119 For several years prior to 1944, Jerome had worked about the Marianna store outside of school hours, on Saturdays and during vacations. For 1943 he received a salary of about $1,900 for his services at the store. Sometime between August 4, 1943, and August 4, 1944, and possibly during the latter part of 1943, Jerome enlisted in the Army Air Corps, but his induction into active service was deferred to allow him to complete his high school education and one semester of college work. From January to June 1944, he attended the Marianna High School, from which he graduated on June 1, 1944. From September through December 1944, he attended the University of Florida, at Gainesville, which is about 200 miles from Marianna. In February 1945, he entered upon active duty with the Air Corps and served from that time until October 1946 at various stations in the United States and in Japan. After his release from the Air Corps, he returned to the University of Florida for one semester, and then went to work in the Marianna store. In 1944, the Marianna store opened for business about 8 a.m. Some of the employees went home at 5 p.m., and others at 6 p.m. At times the store remained open until *120 late in the evening and on one or more occasions as late as 2 a.m. This was chiefly to serve fliers or other soldiers from the army base near by. School hours for Jerome while attending high school in 1944 were from 9 a.m. to 4:30 p.m. He did some studying at home at night. He was a member of the high school band and took part in its activities. Outside of school hours and school duties and activities, he worked at the store on school days, on Saturdays, holidays and, at times, on Sundays. When his father was out of town there were times when he would be in the store "and maybe miss a couple of classes in school." On occasions he accompanied Gluckman on trips to sell merchandise at military establishments in the area of the store. During the period from June 1 to September 1944, his full working time was spent at the store. From September until the end of 1944, he worked in the store when he was at home on holidays. Among the things at times done by Jerome were going to the store prior to opening time, getting things in order for opening and opening the store to the public, the selling of merchandise, helping take inventory, packing and supervising the packing of merchandise, computing *121 mark-ups on merchandise, ordering sizes of merchandise the needed replenishing, taking measurements for fitting garments, making repairs to the electrical installations and equipment, trimming and supervising the trimming of display windows, assisting in the advertising, checking and passing on credits, adjusting customer complaints, handling the cash register, making bank deposits, and the signing of checks. If both of his parents were away at the same time, Jerome was given authority to deal with such problems of management as might arise during their absence. This had also been true in 1942 and 1943. So far as appears, and except that he "didn't take as much of a load" in prior years, his services were a continuation of what he had been doing in 1943. He had a key to the store and knew the combination of the safe. During the time in 1944 when Jerome resided in Marianna, he lived at home with his parents, who paid all expenses of the home and bought his clothing. He paid nothing to them for room and board in 1944. Such money as he withdrew from the business was used by him for incidental expenses and spending money, and some of it was used toward payment of his expenses while at *122 the university. In 1944, Louis Turner had been in the mercantile business for 27 years. During 1944 he continued to be in charge of the Tallahassee store. He did most of the buying for the store. For that purpose he made trips, mostly alone but sometimes accompanied by Lena Turner, to New York and other markets. He placed orders for merchandise when needed and when his services were required, he also sold merchandise. He hired the store's employees and usually signed all of the store's correspondence. Lena Turner also worked at the store. Melvin Turner began working at the Tallahassee store when he was in grammar school, and was paid a salary of about $1,500 for his services in 1943. From January to June 1944, he attended Leon High School in Tallahassee as a member of the sophomore class, and from September through December 1944, he attended the school as member of the junior class. He continued to attend high school until August 1945, but did not graduate because of lack of a small credit. In September 1945, he entered the University of Florida, which he attended until about April 1947. After leaving the University of Florida, he went to work in the store. In 1944, the Tallahassee *123 store opened for business at 9 a.m., and closed at 6 p.m., except on Saturdays, when the closing time was 9 p.m. School hours for Melvin were from 8:30 a.m., until 3 p.m. He did most of his studying at school during a period allotted for that purpose and did little school work at home. After school hours, on Saturdays, during vacations, and, at times, on Sundays and holidays, he worked at the store. Among the things in which Melvin participated were the selling of merchandise, assisting in taking inventory, making some purchases of men's goods and military supplies, checking and marking merchandise, taking measurements for fitting garments, trimming and supervising the trimming of display windows, checking and passing on credits, opening new accounts, adjusting customer complaints, handling the cash register, and occasionally making bank deposits. If both of his parents happened to be away at the same time, he was given authority to deal with such problems of management as might arise in their absence. In 1944, Louis Turner was the only person who had possession of the key to the store, except that when he was absent from Tallahassee, possession was given to Melvin. Only Louis Turner *124 and Melvin knew the combination to the store safe. During 1944 Melvin lived at home with his parents in Tallahassee. His father provided all his support. Such money as Melvin withdrew from the business was used by him as he wished. The business continued to be operated as a partnership until the end of 1946. The following is a statement of the net income or loss of the predecessor corporation. Turner Mercantile Company, Inc., and the partnership, Turner's, for the years 1938 through 1946, as reported on their returns and as adjusted by revenue agent's reports: Net income or loss as
Net income or loss
adjusted by revenue
Year
reported
agent's reports
1938
$ (345.17)
$ (521.13)
1939
1,310.46
2,117.66
1940
3,254.66
6,960.54
Jan. 1 to June 30, 1941
831.94
971.55
July 1 to Dec. 31, 1941
29,703.10
1942
71,630.57
1943
140,032.22
1944
315,049.12
1945
220,709.39
1946
117,586.99
As shown by the partnership returns for 1942 through 1946, sales by the partnership of non-military equipment, military equipment and total sales, exclusive of interstore sales, were as follows: Non-military
Military
Year
equipment sales
equipment sales
Total sales
1942
$545,662.93
$ 1,743.47
$ 547,406.40
1943
872,293.83
129,680.76
1,001,974.59
1944
783,246.34
513,355.95
1,296,602.29
1945
732,883.45
62,439.94
795,323.39
1946
772,623.99
15,003.94
787,627.93
*125 As shown by the partnership returns for 1942 through 1946, sales by the respective stores, exclusive of interstore sales, were as follows: Year
Andalusia
Marianna
Tallahassee
1942
$ 93,690.23
$158,801.60
$293,171.10 [1]
1943
122,972.10
461,876.20
453,351.29 [2]
1944
139,037.40
713,718.55
443,846.34
1945
161,448.88
235,519.37
398,355.14
1946
150,388.78
205,393.52
431,845.59
The partnership maintained no individual capital accounts on its books for any of the partners. It maintained only a single net worth account to which the profit and loss account and the partners' drawing accounts were closed each year. As reported on the partnership returns, the partnership net worth was as follows on the indicated dates: December 31, 1943
$206,825.59
December 31, 1944
400,385.87
December 31, 1945
332,869.41
December 31, 1946
371,910.71
The partnership books disclose withdrawals during 1944 as follows: Income Tax
Other
Payments
Withdrawals
Total
H. S. Turner
$ 9,259.87
$ 5,950.00
$15,209.87
Elizabeth Turner
9,331.55
5,150.00
14,481.55
C. Davis Turner
7,562.51
17,172.49
24,735.00
Gene Abel Turner
13,200.59
5,753.17
18,953.76
Louis Turner
8,990.59
11,100.00
20,090.59
Lena Turner
9,040.06
5,150.00
14,190.06
Rebecca Turner
2,380.71
625.00
3,005.71
Jerome Turner
1,946.46
810.25
2,756.71
Melvin Turner
2,083.17
625.00
2,708.17
Total
$116,131.42
*126 Exclusive of income tax payments, Elizabeth, Gene Abel and Lena Turner withdrew $75 a month for January and February 1944, and $500 a month for the remainder of the year. Beginning August 31, 1944, Rebecca, Jerome and Melvin withdrew $125 a month for the balance of the year. Before that date, neither Rebecca nor Melvin made any withdrawals except for tax payments. Likewise, except for tax payments and an item of $185.25 entered on the books on March 31, 1944, Jerome made no withdrawals prior to August 3, 1944. The $185.25 represented payments made to Jerome as salary for January, February and March 1944, which was originally charged to expense and later charged to his drawing account. The partnership returns for 1944, 1945 and 1946 showed the net incomes reported thereon of $315,049.12, $220,709.39 and $117,586.99, respectively, distributable as follows: Interest
1944
1945
1946
H. S. Turner
3/24
$ 39,381.14
$ 27,588.67
$ 14,698.37
Elizabeth Turner
3/24
39,381.14
27,588.67
14,698.37
C. Davis Turner
3/24
39,381.14
27,588.67
14,698.37
Gene Abel Turner
3/24
39,381.14
27,588.67
14,698.37
Louis Turner
3/24
39,381.14
27,588.67
14,698.37
Lena Turner
3/24
39,381.14
27,588.67
14,698.37
Rebecca Turner
2/24
26,254.10
18,392.45
9,798.93
Jerome Turner
2/24
26,254.09
18,392.46
9,798.92
Melvin Turner
2/24
26,254.09
18,392.46
9,798.92
Totals
$315,049.12
$220,709.39
$117,586.99
*127 For 1944 each of the above-named individuals filed income tax returns reporting as his or her distributive share of income from Turner's the amount indicated on the partnership return filed for that year. On January 1, 1947, a corporation, Turner's, Inc., was organized under the laws of Florida. On that date the corporation took over the business and all the assets of the partnership, except United States Government bonds in the amount of $195,685.50, and assumed the partnership liabilities. For the assets and business, the corporation issued $150,000 par value, or 1,500 shares, of its capital stock, resulting in a paid-in surplus to the corporation of $26,225.51. The stock was issued to the following persons in the following percentages (the same ratio in which partnership profits had been divided) and amounts: Number
Percent
of Shares
H. S. Turner
12 1/2
187
Elizabeth Turner
12 1/2
187
C. Davis Turner
12 1/2
187
Gene Abel Turner
12 1/2
187
Louis Turner
12 1/2
187
Lena Turner
12 1/2
187
Rebecca Turner
8 1/3
126
Jerome Turner
8 1/3
126
Melvin Turner
8 1/3
126
Total
1,500
The Government bonds were divided among the foregoing *128 nine persons in the same ratio as that in which the stock was issued. In the division, Melvin received bonds in the amount of approximately $17,000. He cashed them in the latter part of 1947 and applied the proceeds toward the construction of a home for himself. The disposition made, if any, of the bonds received by Rebecca and Jerome is not disclosed. By the end of 1946, C. Davis Turner had acquired real estate and various other properties in Marianna, and Louis Turner likewise had acquired real estate and various other properties in Jacksonville. During the period from 1941 to the end of 1946, C. Davis Turner had withdrawn considerably more money from the partnership than any of the other partners. Of the other partners, some had withdrawn more than others. To adjust such differences, those who had withdrawn more than their distributive shares executed four per cent interest bearing notes to those who had withdrawn less than their shares. In the adjustment, notes were given, among others, to Rebecca, Jerome and Melvin. Jerome received a note for $14,500 from C. Davis Turner. Melvin received a note for $11,937.18 from Louis Turner, and one for $2,888.39 from Gene Abel Turner. The *129 first signature on Melvin's note from Gene Abel Turner was that of C. Davis Turner, but it was crossed out before delivery to Melvin. Although C. Davis Turner has paid approximately $4,500 on notes executed by him in the adjustment to Louis and Lena Turner and to H. S. or Elizabeth Turner, he has not paid any interest on, or any portion of the principal of, the note he executed to Jerome. Gene Abel Turner has made no payment of either interest or principal on the note executed to Melvin. No interest has ever been paid on the note Louis Turner executed to Melvin, nor did the note, when exhibited at the trial, bear any notation or endorsement of any payment on the principal thereof. In its 1947 income tax return, the corporation, Turner's, Inc., reported that the following named persons were paid the indicated salaries for their full-time services as the indicated officers: Office
Salary
C. Davis Turner
President-Treasurer
$12,000
Louis Turner
Vice President
12,000
H. S. Turner
Secretary
12,000
Gene Abel Turner
Store Manager
6,000
Lena Turner
Store Manager
6,000
Elizabeth Turner
Store Manager
6,000
About December 8, 1941, Turner's, the partnership, *130 filed a status report with the Florida Industrial Commission for unemployment tax purposes, in which it was stated that the business was a partnership composed of H. S., C. Davis and Louis Turner. About November 1, 1943, an additional report was filed showing that Elizabeth, Gene Abel and Lena Turner were also partners. Following the formation of Turner's, Inc., and its acquisition of the business and assets of the partnership, a status report was filed by the corporation about July 15, 1947. In this report it was shown that the corporation had acquired the business of a partnership composed of H. S., C. Davis and Louis Turner. All three reports were signed by C. Davis Turner. The respondent determined that Rebecca, Melvin and Jerome were not members of the partnership during 1944, and adjusted the income of each of their respective parents by adding thereto one-half of the amount of the distributive portion of partnership net income reported by Rebecca, Jerome and Melvin, respectively. The petitioners and Rebecca did, at the beginning of 1944, in good faith and acting with a business purpose, intend to join together as partners in the present conduct of the mercantile business, *131 but the petitioners did not, at any time in 1944, so intend to join together with Jerome and Melvin as partners. Opinion The only question for our determination is whether a bona fide partnership existed between the petitioners and Rebecca, Jerome and Melvin Turner in 1944 for the conduct of the mercantile business theretofore conducted as a partnership by the petitioners as equal partners. The petitioners contend that a new partnership with Rebecca, Jerome and Melvin as partners was formed on January 1, 1944, and continued throughout the year. The respondent contends that neither Rebecca, Jerome nor Melvin was a bona fide partner with the petitioners in the conduct of the business in 1944, but if they were, the new partnership in which they became members was not formed until some time after March 15, 1944. In determining whether a bona fide partnership existed between the petitioners and Rebecca, Jerome and Melvin in 1944, the basic question is, as the Supreme Court stated in : "* * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony *132 of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." From a careful consideration of all the evidence bearing on the question, we have concluded and found as a fact that the petitioners and Rebecca did, at the beginning of 1944, in good faith and acting with a business purpose, intend to join together as partners in the present conduct of the mercantile business, but that the petitioners did not, at any time in 1944, so intend to join together with Jerome and Melvin as partners. The evidence shows that by 1942 Rebecca had reached a stage of maturity in years and judgment and experience with the particular type of business conducted by the Andalusia store which the petitioners recognized and deferred to by limiting the business to the lines considered by her to be the most suitable for that area. In the middle of 1943, she began a period of employment or training with *133 a maternal uncle who conducted a wholesale ladies' ready-to-wear business in Atlanta, one purpose being to broaden her knowledge of the business and render her more proficient in that field. It was her practice to return to Andalusia once a month, and on such occasions she would work for a few days in the store. While in Atlanta, she was at times able to purchase "hard to get" merchandise for the store. Upon her return to the store about June 1, she took over and performed most of the work theretofore performed by her mother who concededly was a member of the partnership. Beginning with June 1944, Rebecca has continued to render fulltime service at the store. Her trip in 1944, some time after June 1, to New York City where, unaccompanied, she selected and purchased substantial quantities of merchandise at various places for the Andalusia store, further indicates the petitioners' full confidence in, and reliance upon, her and her ability and their acceptance of her services in the discharge of the responsibilities as a partner. Giving due consideration to all other factors, favorable and unfavorable, it seems to us that the foregoing tips the balance in favor of Rebecca having been *134 a bona fide partner during 1944. Although the evidence shows that Jerome and Melvin did some buying of merchandise for the stores at which they worked, we are unable to find that such buying was little else than placing orders for items of merchandise regularly carried of which the stock was low or in need of replenishing. So far as appears, their buying did not involve the discretion or judgment required in the selection of substantial quantities of new or different styles or types of merchandise, as was the case in the buying done by Rebecca. Neither of the boys went on any such trips as her New York trip. Their fathers made such trips for their stores. While there is testimony to the effect that in the absence of both of their parents in 1944, Jerome and Melvin were in charge of the stores at which they worked, it further shows that that was true in the case of Jerome in 1942 and 1943, or over a period prior to when it is claimed that he became a partner in the business; and there is no showing that they did or performed any duties of management over or beyond those of a routine character, nor is it shown that it was anticipated that they would be faced with problems beyond *135 routine. The record leaves no doubt that C. Davis Turner was the active controlling manager of the affairs of the Marianna store and that likewise Louis Turner acted in the same capacity at the Tallahassee store. Nothing of importance was done at the respective stores without their authorization or approval. In this connection, it is significant that upon the dissolution of the partnership and the formation in 1947 of a new corporation, neither Jerome nor Melvin was given any office, either administrative or managerial, even though they were three years older than in 1944 and had the same proportional interest in the business as in 1944. The partnership agreement entered into by the petitioners in 1941 was in writing. However, in 1944, when gifts of interest in the partnership were made to Rebecca, Jerome and Melvin, no new written agreement was entered into by the petitioners and the donees, nor was any amendment added to, or provision inserted in, the 1941 written agreement to indicate the addition of the donees to the partnership. There is testimony to the effect that when the parents of the donees gave them the instruments of gifts the donees in accepting those instruments were *136 informed, understood, and agreed that such acceptance made them members of the partnership and as such they would share in the profits and losses to the extent of their interest in the firm. There is also testimony that during 1944 the business was operated under the 1941 agreement with the provisions thereof, modified as to partners' interests by the gifts, continuing in effect. The fact that C. Davis Turner continued throughout 1944, as in prior years, to act as managing director of the business without any showing that the donees participated in his selection lends support to the testimony that during 1944 the business was operated under the 1941 agreement as modified. That agreement contained provisions for the continuation of the business after the death of one or more of the partners, particularly male partners. The agreement provided that upon the death of any of the male partners the surviving male partners should have the exclusive right to manage the business. The agreement also provided that upon the death of a male partner his widow, under stated conditions, should have the right to retain her employment at the partnership place of business at which she was working when *137 her husband died, but that the decision as to whether the store at which she was employed should be continued in operation should be left entirely to the determination of the surviving male partners or partner. The agreement further provided that the partnership should continue during the pleasure of the partners. From the foregoing, it is apparent that if the three Turner brothers and Jerome had died, for instance in 1944, Melvin, a 15-year-old school boy with no responsible business experience, would have had, as against his mother, his aunts and Rebecca, the exclusive right to manage the business, a right which he was obviously incapable of exercising. Furthermore, under those circumstances, the closing of any or of all the stores would have been left to his sole determination without interference from any of the interested female parties. In event of the death of the Turner brothers and Melvin, Jerome would have had like powers as those just mentioned as to Melvin. Furthermore, under that agreement, either Jerome or Melvin could have dissolved the partnership and caused a liquidation of its affairs at any time in 1944. With the Turner brothers being the businessmen they were, with *138 approximately thirty or more years of business experience, and with their wives likewise having had business experience, it is difficult to conclude that they would have accepted Jerome and Melvin into a partnership on any such terms. However, if such in fact was the case, it was undoubtedly with the intention that through the exercise of parental control the boys would be restrained to conform their actions to the desires of the surviving or remaining partners. The fact that the income from donated property invested in a business is left in the business is a factor militating against the donee of the property having become a bona fide partner in the business. Jerome, for services rendered to the business in 1943, received compensation of about $1,900, while Melvin received about $1,500 as compensation for his services during the same year. Except for taxes, their withdrawals in 1944 from the business were only about one half, or less, of their salaries for the preceding year. The only explanation offered by them for the small withdrawals was that they did not need the money and wanted to leave it in the business. Their 1944 respective total withdrawals, including those for taxes, *139 were less than one-ninth of their distributive shares of the net profits as shown on the partnership return for that year. Their fathers' withdrawals ranged from over one-half to upwards of two-thirds of their distributive shares and their mothers' withdrawals ranged from more than one-third to upwards of one-half of their distributive shares. It is apparent that there was a gross disproportion between the withdrawals of Jerome and Melvin and those of their parents, with approximately 90 per cent of the reported distributive shares of Jerome and Melvin remaining in the business. To what extent this disproportion was adjusted in a later year or years, is not shown, except that upon dissolution of the partnership and the formation in 1947 of the new corporation, Jerome received a note for $14,500 from his father on account of the profits represented by Jerome's share which had been left in the business, and Melvin received a note for $11,937.18 from his father and a note for $2,888.39 from his aunt, Gene Abel Turner, on account of profits from Melvin's share which had been left in the business. No payment of either principal or interest has ever been made on Jerome's note, or on Melvin's *140 note from his aunt. Nor has any interest ever been paid on Melvin's note from his father. There is testimony by Melvin and his father that payments totaling about $2,100 were made at intervals from 1947 to 1949 on the principal of the father's note. Their testimony indicates that the amount represents payments made by the father for rugs and other furnishings purchased by him for Melvin's house. No endorsement has been made on the note of any payment on the principal thereof, nor was any explanation offered as to why, if the alleged payments had been made, some endorsement thereof had not been made on the note. The foregoing factors, considered in connection with all others, in our opinion tip the balance against the conclusion that the petitioners at any time in 1944 intended to join together with Jerome and Melvin as partners for the present conduct of the business. The respondent points to several factors in support of his contention that if Rebecca, Jerome and Melvin were members of the partnership in 1944, they did not become so until sometime after March 15, 1944. Since we have concluded that of the three only Rebecca was a partner in 1944, our consideration of the respondent's *141 contention will be limited only to matters relating to her. The strongest matter relied on by the respondent is the statement of a witness for the petitioners to the effect that Rebecca's parents stated that when Rebecca came back from Atlanta they gave her an interest in the partnership. A consideration of other portions of testimony of that witness indicates that the parents made the statement about the gift at the beginning of 1944. Rebecca testified that the instruments of gifts executed by her parents and bearing an execution date of January 1, 1944, were given to her in January 1944. From the evidence bearing on the question, it is our opinion that she became a member of the partnership at the beginning of 1944. Decisions will be entered for the respondent in Docket Nos. 23876, 23877, 23878 and 23879. Decisions will be entered under Rule 50 in Docket Nos. 26020 and 26021. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Lena Turner, C. Davis Turner, Gene Abel Turner, H. S. Turner and Elizabeth Turner.↩
2. It is noted that one-twenty-fourth of a one-sixth interest is a one-one-hundred-forty-fourth interest, whereas in the preceding paragraph the transfer of a one-twenty-fourth interest is recited.↩
1. Allocation is also exclusive of military equipment sales. ↩
2. Allocation contains interstore sales.↩